# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **WALTER W. WALLACE, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:17-CV-490-PLC** |
| | ) | |
| | ) | |
| **STE. GENEVIEVE DETENTION CENTER,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court[1] on the motion for summary judgment filed by Defendants Sheriff Gary Stolzer and Sergeant Patti Karol (collectively, "Defendants"). [ECF No. 55] Plaintiff, an inmate formerly housed at the Ste. Genevieve Detention Center ("Detention Center"), filed a pro se complaint against Defendants[2], in their official and individual capacities, seeking declaratory and monetary relief under 42 U.S.C. §§ 1983 and 1985 for Defendants' alleged violation of Plaintiff's First Amendment right to exercise his religion. [ECF No. 9] Specifically, Plaintiff claimed that he "is a Sunni Muslim who follows the Harafi school of Sunni law" and Defendants denied his requests for: (1) his "religious headwear specifically a 'Kufi'"[3]; (2) his "Islamic Prayer Rug"; and (3) "the ability to engage in 'Congregational Prayer.'" [Id.]

---

[1] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). [ECF No. 26]

[2] In addition to Defendants Stolzer and Karol, Plaintiff sued the Detention Center. The Court dismissed Plaintiff's claims against the Detention Center because "departments or subdivisions of local governments are 'not juridical entities suable as such.'" [ECF No. 10 (quoting <u>Ketchum v. City of West Memphis, Ark.</u>, 974 F.2d 81, 82 (8th Cir. 1992)]

[3] Plaintiff describes a kufi as a "cap…made of fabric that is crocheted or knitted." [ECF No. 62-1 at ¶ 5] In his declaration, Plaintiff explained that he followed the "Hanafi school of Sunni law" and believed that "Muslim men are required to wear a Kufi at all times as a sign of piety that will

Defendants deny the allegations and move for summary judgment arguing that: (1) Plaintiff's claims are moot; (2) Plaintiff failed to exhaust his administrative remedies; and (3) "there is no genuine dispute as to any material fact." [ECF No. 55] Plaintiff counters that: (1) his transfer to a different facility did not moot his claim for monetary relief; (2) he exhausted his administrative remedies; and (3) "the evidence and conflicting testimony from Defendants shows that their decisions were not reasonably related to any legitimate penological interest." [ECF No. 61]

## I. Background

Plaintiff was incarcerated at the Detention Center from September 23, 2016 until April 3, 2017. [ECF No. 62 at ¶ 2] During that time, Defendant Karol was the Detention Center's assistant jail administrator and Defendant Stolzer was the Sheriff of Ste. Genevieve County, Missouri. [Id. at ¶¶ 3-4] Defendant Karol's responsibilities as assistant jail administrator included handling "inmate issues such as inmate grievances and requests." [Id. at ¶ 5] Defendants Karol and Stolzer were "considered decision-makers regarding religious accommodations." [ECF No. 57 at ¶ 5]

The Ste. Genevieve County Sheriff's Office Detention Center Operational Procedures & Policy ("Detainee Handbook") defined "contraband" as "any article that has not been issued to you or approved for possession in this facility." [ECF No. 57-2 at 2] According to the "Dress Code" set forth in the Detainee Handbook: "Head coverings of any sort are not allowed in this facility without Administration authorization. A facility authorized Hijab or Kippah may be authorized for religious reasons only." [Id. at 4]

---

be rewarded by God. Wearing a Kufi is required by the sunnah, the traditional social and legal custom and practice of the Islamic community." [Id. at ¶¶ 3-4]

When Plaintiff arrived at the Detention Center, he had in his possession a woven, Islamic kufi, which he obtained at the Lincoln County Jail, and an Islamic prayer rug, which he purchased from the commissary at the St. Louis County Jail. [ECF No. 62 at ¶¶ 13, 54, 55] Detention Center staff confiscated these items. [Id. at ¶ 15, 58]

The following day, Plaintiff submitted an "inmate grievance form,"[4] explaining the religious significance of his kufi and "gracefully asking that my 'Kufi' and 'Prayer Rug' be giv[en] back to me." [ECF No. 57-3 at 16] Two days later, on September 26, Plaintiff submitted an inmate request explaining that, pursuant to "the Islamic school of thought I practice under[,] it's mandatory that I wear my 'Kufi' and utilize a 'Prayer Rug.'" [[Id. at 15] Plaintiff requested the return of these items "as soon as possible." [Id.]

Defendant Karol denied Plaintiff's request on September 26, 2016. [Id. at 15, 16] In regard to the prayer rug, Defendant Karol stated: "I will have staff give you an extra towel to serve as your prayer rug." [Id.] As to the kufi, Defendant Karol advised:

> [W]e will allow a solid black or white kufi if your family would like to send one in to my attention for approval. It must be "corrections safe" material (preferably one layer with no double layer sewn areas) + fairly sheer. Once I receive + inspect it, you will receive it as long as it qualifies for our facility. I will not delay your receipt of it any longer than absolutely necessary.

[Id.]

On September 28, Plaintiff submitted an inmate grievance form, reiterating his request for his kufi and prayer rug. [Id. at 13-14] Plaintiff alleged that Defendant Karol's decision to withhold these items violated his rights under the First Amendment, the Religious Freedom Restoration Act (RFRA), and the Religious Land Use and Institutionalized Person Act (RLUIPA). [Id.] Defendant warned that, if Defendants refused to return his religious items, he

---

[4] According to the Detention Center policies and procedures, the first step in the grievance process is an inmate request form, not a grievance form.

would file a civil lawsuit under section 1983. [Id.] In response, Sgt. Karol referred Plaintiff to her response of September 26 and stated: "I am not denying you any religious materials however we do not allow what you have in your property. I provided you with the remedy to this situation that would allow you to fulfill your observances." [Id. at 13]

In an inmate request dated October 6, 2016, Plaintiff again inquired about his prayer rug. [Id. at 12] Defendant Karol responded on October 10, referring Plaintiff to "the process outlined in the Inmate Handbook." [Id.]

Plaintiff appealed the denial of his kufi and prayer rug.[5] [ECF No. 57-3 at 9] Defendant Stolzer denied Plaintiff's appeal in a grievance appeal response dated October 20, 2016. [Id. at 11] Defendant Stolzer explained that Plaintiff's prayer rug "was denied due to it being a woven material that we do not allow in this facility for security reasons," and stated that Defendant Karol "provided you with an extra towel to serve as your Prayer Rug during your incarceration here….as we have provided to several past detainees." [Id.] In regard to Plaintiff's kufi, Defendant Stolzer wrote:

> Your Kufi was denied for two reasons. It is constructed of woven material that we do not allow in this facility and the fact that the structural integrity of the Kufi has been comprised as a seam has been opened. This lends to the ability to secret[] items and therefore has become a security risk. According to your booking file, Sgt. Karol has also provided you with specific details as to what we do allow and the instructions as to how to go about receiving one that would be allowed.

[Id.] In closing, Defendant Stolzer stated "we are absolutely not denying you access to materials related to the observance of your religion" and "we have given you a reasonabl[e] remedy to be able to receive items to facilitate your observances while maintaining the security and safety of this facility." [Id.]

---

[5] Although submitted on an inmate grievance form, Plaintiff wrote: "This is my grievance appeal notification." [ECF No. 57-3 at 9]

Plaintiff submitted another inmate request the next day, seeking an explanation as to why a woven prayer rug constituted a security concern. [Id. at 7] Defendant Karol responded: "Grievance Appeal was answered + closes that issue." [Id.]

In an inmate request[6] dated December 21, 2016, Plaintiff informed the Detention Center's administration that Keefe Commissary[7] "has religious wear such as 'kufis' and 'prayer rugs' for sale" and they provided these items to the St. Louis County and St. Louis City jails. [Id. at 5] Plaintiff "respectfully request[ed] that these religious items be put on the commissary for purchase." [Id.] Defendant Karol denied the request, stating: "Arrangements for any religious items must go through Administration. Sincerity of belief must be established prior to allowing head gear or any other items." [Id.]

On December 28, Plaintiff submitted his request to engage in congregational prayer with "the other 'Muslims' that [are] housed in the facility." [Id. at 4] In particular, Plaintiff wished to pray with other Muslims during the "last prayer, which is the 'Isha Prayer.'" [Id.] Defendant Karol denied the request because "[d]etainees from different blocks are not allowed to co-mingle." [Id.] Defendant Karol concluded: "You'll need to perform your observance with those in your block only." [Id.]

The next day, Plaintiff submitted an inmate request for Jumu'ah Services on Fridays because "Friday is a holy day for all Muslims across the world to come together and read from the 'Holy Quran' and worship." [Id. at 3] Defendant Karol again responded that the Detention

---

[6] Although Plaintiff submitted this request on an inmate grievance form, he worded it as a request. [ECF No. 57-3 at 5] Defendant Karol recognized it as a request, stating in her response: "This is a request, not a grievance." [Id. (emphasis in original)]

[7] According to Defendant Stolzer's deposition testimony, "commissary" is the "generic term for the…company that sells things that inmates can buy while they're incarcerated." [ECF No. 62-2 at 7] Keefe Commissary was the company providing commissary services while Plaintiff was housed at the Detention Center. [Id.]

Center did "not intermingle blocks," but Plaintiff was permitted to pray with inmates in his "own block." [Id.]

In his final inmate request, dated January 3, 2017, Plaintiff asked Defendant Karol to transfer him to K-unit because it had "the most 'Sunni Muslims' that I can practice my religious belief with." [Id. at 2] Plaintiff wrote:

> From my understanding, I was placed in "E-Unit" so I can practice my religious belief with "Said Ali." He is no longer here thereby leaving me in "E-Unit" without a Muslim that I can reflect the religion with. I am aware there's individual[s] that have received disciplinary infractions and still was able to go to "K-Unit." Allow me the ability to practice my faith with my brothers.

[Id.] Defendant Karol denied placing Plaintiff "in any block because of any other detainee's religion; you are placed by our designation and what is available." [Id.] She further stated: "You are either PC[, protective custody,] or you are GP[, general population]. No detainee gets to pick + choose their housing unit. You claiming you need PC because you aren't allowed to house where you want is unacceptable. You either need PC or you don't." [Id.] The Bureau of Prisons transferred Plaintiff to a correctional institution in Indiana in April 2017. [ECF No. 14]

Plaintiff filed his section 1983 complaint in February 2017. [ECF No. 1] In his first amended pro se complaint, Plaintiff alleged Defendants, in their individual and official capacities, violated his First Amendment rights by denying: (1) "my religious headwear specifically a 'kufi'"; (2) "my 'Islamic Prayer Rug'"; and (3) "the ability to engage in 'Congregational Prayer.'"[8] [ECF No. 9 at 6] In addition to monetary relief, Plaintiff requested the courts "instruct [the Detention Center] to allow 'Muslims' the ability to wear a kufi, use [an] Islamic prayer rug, and [engage in] congregational prayer." [Id. at 10]

---

[8] The Court granted Plaintiff's motion to appoint counsel after Plaintiff filed the amended complaint and while the parties were completing discovery. [ECF No. 31]

Defendants deny the allegations and move for summary judgment on all three of Plaintiff's section 1983 claims. [ECF No. 55] Plaintiff opposes the motion. [ECF No. 61]

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## III. Discussion

Defendants contend that they are entitled to summary judgment because: (1) Plaintiff's claim for injunctive relief is moot because Plaintiff is no longer housed at the Detention Center; (2) Plaintiff failed to exhaust his administrative remedies before filing suit; (3) the Detention

Center's policies and Defendants' denial of Plaintiff's request are reasonably related to the safety and security of the Detention Center; and (4) qualified immunity precludes liability because Defendants did not violate any of Plaintiff's clearly established rights.  [ECF No. 56]   Plaintiff counters that:  (1) Plaintiff's claim for monetary relief is not moot; (2) Plaintiff exhausted the administrative remedies available to him; and (3) Defendants are not entitled to qualified immunity because they violated his clearly established constitutional right to freely exercise his religious beliefs.  [ECF No. 61]

A.  *Mootness*

Defendants assert that Plaintiff's claim for injunctive relief is moot because Plaintiff is no longer incarcerated at the Detention Center and, therefore, no longer subject to Defendants' allegedly unconstitutional actions.  [ECF No. 56 at 3]  Plaintiff does not dispute this contention. [ECF No. 61 at 5]

When a prisoner has been transferred to a different correctional facility, his claims for injunctive and declaratory relief are properly denied as moot.  See Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 835 (8th Cir. 2009); Pratt v. Corr. Corp. of Am., 267 Fed. Appx. 482, 482 (8th Cir. 2008).  Because Plaintiff's claims for injunctive relief are rendered moot by his transfer from the Detention Center, the Court dismisses them.

B.  *Exhaustion of Remedies*

Defendants claim they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies.   More specifically, Defendants maintain that Plaintiff completed the grievance process only "as it pertains to" the return of "***his*** Kufi and ***his*** prayer rug."  [ECF No. 56 at 4]  Plaintiff did not, Defendants argue, request the right to wear any Kufi or possess any prayer rug.  Defendants further assert that Plaintiff did not complete the three-step

grievance process for congregational prayer. In response, Plaintiff states he properly exhausted his administrative remedies and Defendants' "hyper technical view of the exhaustion of remedies doctrine finds no support in the law." [ECF No. 61. At 6]

Pursuant to the Prison Litigation Reform Act (PLRA), a prisoner may not bring an action under section 1983 "until such administrative remedies as are available are exhausted." 47 U.S.C. § 1997e(a). The purpose of the PLRA's exhaustion requirement is to afford corrections officials "the time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93 (2006) (quoting Porter v. Nussle, 534 U.S. 516, 525 (2002)).

"Exhaustion" under section 1997e(a) means "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." Hammett v. Cofield, 681 F.3d 945, 947 (8th Cir. 2012) (emphasis in original). An inmate exhausts his administrative remedies by pursuing "the prison grievance process to its final stage" to "an adverse decision on the merits." Burns v. Eaton, 752 F.3d 1136, 1141 (8th Cir. 2014) (quoting Hammett, 681 F.3d at 947-48)). The level of detail necessary to comply with grievance procedures "will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007). "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015) (citing Jones, 549 U.S. at 211-12).

According to the three-step grievance procedure set forth in the Detainee Handbook, an inmate "with a problem or concern" may initiate the grievance procedure "via a General

Request."[9]  [ECF No. 57-2 at 8]  If the Detention Center's response to the general request "does not meet the detainee's satisfaction, it should be brought to the attention of Administration via a Grievance Request[.]"  [Id. at 9]  The Detainee Handbook required an inmate to include the following information in his grievance request:  (a) "[t]he rule, regulation, policy or circumstances about which the detainee is filing a grievance"; (b) "[s]pecific details of the grievance including the date, time, location of the incident, persons involved & any relevant information"; and (c) a list of "informal actions [] taken to resolve the issue at hand."  [Id. at 9]  If the Administration's response to the grievance request does not resolve the matter, the detainee may "submit another Grievance Request" and designate it "APPEAL."  [Id.]  The Sheriff or his designee had fifteen days to issue a final decision, which resolved the issue and "conclude[d] the procedure."  [Id.]

Defendants concede that "Plaintiff completed the grievance process as it pertains to *his* Kufi and *his* prayer rug."[10]  [ECF No. 56 at 4]  Defendants argue, however, that Plaintiff now attempts in his section 1983 complaint to broaden the alleged constitutional violation from the

_____

[9] The Court notes that the Detainee Handbook provided by Defendants bears a revision date of December 2017.  [ECF No. 57-2 at 14]  Plaintiff's detention ended in April 2017.  This might explain discrepancies between the grievance process undertaken by Plaintiff and the one described in the Detainee Handbook.  For example, the Detainee Handbook referred to the required forms as "General Request" and "Grievance Request," but the forms submitted by Plaintiff were titled "Inmate Request" and "Inmate Grievance Form."  Additionally, the Detainee Handbook referred to a "kiosk," at which detainees typed their requests.  Plaintiff submitted his inmate requests and grievances in writing.

[10] In his grievance appeal, Plaintiff alleged that, on September 27, 2016 and October 10, 2016, "I was informed that my 'Prayer Rug' would not be permitted for my utilization."  [ECF No. 57-3 at 9].  Although Plaintiff referred generally to an inmate's right to a kufi, prayer rugs, and congregational prayer, his only explicit request was for "my prayer rug out of my property please."  [Id.]  Because the PLRA's exhaustion requirement is an affirmative defense, and Defendants do not assert that Plaintiff failed to exhaust the issue of Plaintiff's kufi, the Court deems the defense waived for purposes of Defendants' summary judgment motion.  See e.g., Johnson v. Doyle, No. 4:07-CV-1843-AGF, 2011 WL 846141, at *5 (E.D. Mo. March 8, 2011).  See also Woodford, 548 U.S. at 101 ("the PLRA exhaustion requirement is not jurisdictional").

denial of *his* kufi and prayer rug to the denial of *any* kufi and prayer rug. [Id.at 5] Plaintiff counters that his request that Defendants make kufis and prayer rugs available in the commissary, coupled with his requests for the return of his kufi and prayer rug, "ma[de] clear that Plaintiff would have accepted *any* Kufi and *any* Islamic prayer rug[.]" [ECF No. 61]

A review of the record reveals that Plaintiff appealed, and Defendant Stolzer affirmed, the denial of his kufi and prayer rug in October 2016. Plaintiff did not submit his request that the Detention Center make kufis and prayer rugs available in the commissary until December 2016. Nor did Plaintiff provide notice that Defendant Karol's suggested remedies – that Plaintiff obtain a "corrections safe" kufi and use a towel in place of prayer rug – were unsatisfactory. As a result, the Court finds that Plaintiff exhausted his administrative remedies solely as to the deprivation of his personal religious items.[11]

In regard to Plaintiff's request to engage in congregational prayer, attend Jumu'ah Services, and/or transfer to a different housing block with more Muslim inmates, Plaintiff submitted only inmate requests, which constituted the first step of the grievance process. Plaintiff does not dispute that he failed to file a timely grievance request or grievance appeal with respect to his desire for congregational prayer. As a result, Plaintiff's section 1983 claim that Defendants violated his First Amendment rights by denying him the opportunity to engage in congregational prayer fails because Plaintiff did not properly grieve this issue before filing suit in this Court. See, e.g., Watson v. Witty, No. 2:16-CV-71-HEA, 2019 WL 118556, at *2 (E.D. Mo. Jan. 7, 2019); Human v. Hurley, 2:17-CV-8-ERW, 2018 WL 1519376, at *4 (E.D. Mo. March 28, 2018).

---

[11] However, because constitutional analysis requires consideration of available alternative means for Plaintiff to exercise the infringed upon right and available alternatives to the challenged policy or action, Defendants cannot avoid these issues entirely. See Gladson, 551 F.3d at 831–32.

The Court grants Defendants summary judgment based on Plaintiff's failure to exhaust his administrative remedies with respect to the alleged violations of his right to wear any kufi, possess any prayer rug, and pray with other Muslims. The questions of whether Defendants violated Plaintiff's First Amendment rights by confiscating his kufi and prayer rug remain before the Court.

*C. First Amendment Rights*

Defendants seek summary judgment on Plaintiff's section 1983 claims that they violated his First Amendment rights, arguing that the denial of Plaintiff's requests for his kufi and prayer rug were "reasonably related to safety and security at the Detention Center." [ECF No. 56 at 5] Defendants further argue that, even if confiscation of Plaintiff's kufi and prayer rug violated his free exercise rights, Defendants are entitled to qualified immunity because there was no clearly established law permitting Plaintiff to possess his own kufi and prayer rug. [Id. at 15]

Plaintiff counters that Defendants' actions "made it *impossible* for Plaintiff to *ever* exercise his sincerely held religious beliefs in their facility." [ECF No. 61 at 9 (emphasis in original)] Plaintiff further asserts that "a reasonable jury could conclude that Defendants' actions were not the least restrictive means of carrying out their stated goals of safety and security,[12] and were not reasonably related to those goals at all." [Id.]

Inmates retain protections afforded by the First Amendment "including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). However, "limitations may be placed on the exercise of those rights in light of the

_____

[12] The Court notes that the least-restrictive-alternative test does not apply in First Amendment claims brought pursuant to section 1983. Overton v. Bazzetta, 539 U.S. 126, 136 (2003) The Supreme Court's standard for considering inmates' free exercise claims "does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." Id.

needs of the penal system." Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 982 (8th Cir. 2004).

See also O'Lone, 482 U.S at 348. "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" Id. (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

To prevail on a free exercise claim under section 1983, a plaintiff must show that (1) he held a sincere religious belief and (2) the official action substantially burdened his exercise of that belief.[13] Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699 (1989). See also Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008)). If the challenged governmental action substantially burdened a sincerely held religious belief, the defendant official must demonstrate "a reasonable relationship" between the policy or action that impeded the plaintiff's free exercise of religion and "some legitimate penological interest." Love v. Reed, 216 F.3d 682, 690 (8th Cir. 2000) (quoting Turner, 482 U.S. at 89). Courts give "great deference to the judgment and expertise of prison officials, particularly with respect to decisions that implicate institutional security." Gladson, 551 F.3d at 831-32 (quotation omitted). "The burden…is not on the [defendant] to prove the validity of prison regulations but on the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

In addition to arguing that they did not violate Plaintiff's constitutional rights, Defendants claim they are entitled to qualified immunity. "The doctrine of qualified immunity protects

---

[13] To substantially burden one's free exercise of religion, a limitation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities in those activities that are fundamental to a person's religion.

Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008) (quoting Murphy, 372 F.3d at 988). See also O'Lone, 482 U.S. at 348.

government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "In analyzing a claim of qualified immunity, [a court] may examine the two key prongs . . . in either order." Moore v. City of Desloge, Mo., 647 F.3d 841, 846 (8th Cir. 2011) (citing Camreta v. Greene, 563 U.S. 693, 705 (2011)).

### 1. *Official capacity claims*

As an initial matter, Plaintiff sued Defendants in their individual and official capacities. "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). See also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978) (A suit against a government official in his or her official capacity is "another way of pleading an action against an entity of which an officer is an agent."). Thus, to prevail on his action against Defendants in their official capacities, Plaintiff must prove that Ste. Genevieve County ("the County") "*itself* caused the constitutional violation at issue."[14] Marsh v. Phelps Cty, 902 F.3d 745, 751 (8th Cir. 2018) (emphasis in original).

---

[14] Defendants were both employees of the St. Genevieve County Sheriff's Department. However, "departments or subdivisions" of local government "are not juridical entities suable as such." Ketchum v. City of West Memphis, Ark., 974 F.2d 81, 82 (8th Cir. 1992). See also Owens v. Scott Cty. Jail, 328 F.3d 1026, 1027 (8th Cir. 2003).

Municipal liability may attach if the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." Mick v. Raines, 883 F.3d 1075, 1089 (8th Cir. 2018). A plaintiff need not specifically plead the existence of an unconstitutional policy or custom. Doe ex rel. Doe v. Sch. Dist. of City of Norfolk, 340 F.3d 605, 614 (8th Cir. 2003). However, at a minimum, the complaint must allege facts supporting the proposition that an unconstitutional policy or custom exists. Id.

While Plaintiff's amended complaint refers generally to the Detention Center's "policies or customs," Plaintiff has not alleged facts supporting a municipal liability claim. [ECF No. 9 at 6, 9] To begin, Plaintiff does not allege that the County's official policies restricting headwear and contraband in the Detention Center were facially unconstitutional. "[A] plaintiff seeking to establish municipal liability on the theory that a *facially lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 390 (8th Cir. 2007) (emphasis in original) (citing City of Canton v. Harris, 489 U.S. 378, 407 (1989)). The facts, as alleged by Plaintiff, do not suggest deliberate indifference. Likewise, Plaintiff alleged no facts suggesting that the infringement on his free-exercise rights resulted from a deliberately indifferent failure to train or supervise on the part of the County. See, e.g., McCarver v. Crawford Cty. Sheriff's Dep't, No. 4:18-CV-1976-JAR, 2019 WL 1317404, at *5 (E.D Mo. March 22, 2019); Porter v. Cape Girardeau Cty. Sheriff's Office, No. 1:18-CV-139-AGF, 2018 WL 4300277, at *5 (E.D.Mo. Sept. 9, 2018).

This leaves "custom"[15] as the only alternative by which Plaintiff can allege municipal liability against the County. To that end, Plaintiff's amended complaint can be read as an attempt to assert the existence of an unofficial custom of interfering with inmates' free exercise of religion by confiscating items of religious significance, such as kufis and prayer rugs. However, Plaintiff did not provide any facts suggesting that the Defendants confiscated such items from other inmates. Nor did Plaintiff allege that other inmates requested, and were denied, approval to wear kufis or possess prayer rugs. See Ulrich v. Pope Cty., 715 F.3d 1054, 1061 (8th Cir. 2013) ("Generally, an isolated incident of alleged [] misconduct….cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983."). Accordingly, Plaintiff failed to state a claim of municipal liability based on an unofficial custom.

For the reasons discussed above, Plaintiff failed to state a municipal liability claim against the County. The Court therefore dismisses Plaintiff's official capacity claims against Defendants.

### 2. *Individual capacity claims*

#### a. Plaintiff's kufi

Defendants maintain that they did not violate Plaintiff's free exercise rights because the Detention Center's policy regarding religious headwear, and Defendants' decision in regard to

---

[15] To establish municipal liability based on a custom, a plaintiff bears a "heavy burden" to demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials of the misconduct; and (3) that the plaintiff was injured by acts pursuant to the municipality's custom, meaning that the custom was the moving force behind the constitutional violation. Mick, 883 F.3d at 1079 (citing Mettler v. Whitledge, 165 F.3d 1197, 1200 (8th Cir. 1999)).

Plaintiff's kufi, was reasonably related to valid penological interests.[16]   [ECF No. 56]   In response, Plaintiff contends that, in light of Defendants' contradictory testimony, they failed to establish a reasonable relationship between the confiscation of his kufi and valid penological objectives

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  O'Lone, 482 U.S. at 349 (quoting Turner, 482 U.S. at 89).  To determine whether an official's action was reasonably related to a legitimate penological interest, a court considers the following four factors identified by the Supreme Court in Turner:

> (1) whether there is a "valid rational connection" between the prison regulation and the government interest in justifying it; (2) whether there is an alternative means available to the prison inmates to exercise the right; (3) whether an accommodation would have a significant "ripple effect" on the guards, other inmates, and prison resources; and (4) whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests."

Gladson, 551 F.3d at 831 (quoting Turner, 482 U.S. at 89-91)).  See also O'Lone, 482 U.S. at 349-50.  "The same standard applies to challenges based on prison authorities' actions as prison regulations."  Butts v. Martin, 877 F.3d 571, 585 (5th Cir. 2017).

The Detention Center policy prohibited headwear that was not "authorized religious headwear."  [ECF No. 62-3 at 54; see also ECF No. 57-2 at 4]  In her deposition, Defendant Karol explained that she inspected Plaintiff's kufi and declined to authorize its wear because the kufi was "woven…in such a way with seaming and very thick woven material in which something could be secreted into it, hidden inside the item."  [ECF No. 57-1 at 7]  In particular, Defendant Karol opined that an inmate could hide medication and razors in his or her headwear.

---

[16] For purposes of their summary judgment motion, Defendants neither challenge the sincerity of Plaintiff's religious beliefs nor assert that confiscating Plaintiff's kufi did not substantially burden the practice of his religion.

[Id.]  When deciding whether to authorize a particular religious item, Defendant Karol relied on her "past experience" to determine "whether or not something can be hidden in it or if something can be removed from it that poses a risk."  [Id. at 11]

Defendant Karol maintained that she did not withhold Plaintiff's kufi because of its religious significance, and she permitted inmates to wear kufis that were "correction safe."  [Id. at 8; ECF No. 62-3 at 71]  According to Defendant Karol, correction-safe kufis were "normally very sheer, very thin, and…if there's a seaming – they're made of material that…we can either easily feel if anything is secreted in there or you can actually see through the material."  [ECF No. 62-3 at 51]  Defendant Karol explained that, when responding to Plaintiff's inmate request, she advised him to obtain a black or white kufi because "the only correction safe or corrections authorized kufis or headgear that I have seen myself personally in the past have always been either white or black….I felt like if I specified that for him, that it would be easier for his family to find what would be authorized."[17]  [ECF No. 62-3 at 102]  She conceded, however, that the color of the kufi was "not relevant" to its approval for use in the Detention Center.  [Id. at 51]

Defendant Stolzer, who was "ultimate[ly] the person in charge of operations at the [D]etention [C]enter" and affirmed the appeal of Plaintiff's grievance, testified at his deposition that he did not inspect Plaintiff's kufi.  [ECF No. 62-2 at 27, 46-47]  Defendant Stolzer did not know whether the Detention Center had policies relating to religious headwear.  [Id. at 36-38]  Defendant Stolzer explained that he denied Plaintiff's request for the return of his kufi because "unless I issue [an item of clothing] to you, it's contraband."  [Id. at 62]  Unlike Defendant Karol, who denied Plaintiff's kufi because it was a thick, woven material, Defendant Stolzer stated that the "thickness" of Plaintiff's kufi "does not matter" and "[t]he only thing that matters

---

[17] Defendant Karol acknowledged that "when I Googled it, I found places that sell them," but "I don't believe they say correction safe[.]"  [ECF No. 62-3 at 104]

is that [Plaintiff's] kufi…w[as] not given to him by the Ste. Genevieve County Detention Center[.]" [Id. at 65-66]

Defendant Stolzer also contradicted Defendant Karol's testimony that Plaintiff would have been permitted to wear a correction-safe kufi received by mail from a friend or family member. Defendant Stolzer testified in his deposition that "if [Plaintiff] bought [a kufi] through…a company or had it shipped in like we do books, it would be fine." [Id. at 72] However, Plaintiff would not have been permitted to possess a kufi sent by a relative or friend because: "If they can soak letters in methamphetamine and get dope in my building what the hell can they put in a kufi." [Id. at 79] According to Defendant Stolzer's testimony, the safety and security concern surrounding Plaintiff's kufi was its unknown origin and not the kufi itself. He affirmed that "if [he] approved of a kufi and [he] gave it to the Muslim inmate…, then once the inmate has possession of it, it wouldn't be anymore [sic] security concern than any other article of clothing...." [Id. at 81]

Applying the Turner factors to determine whether the confiscation of Plaintiff's kufi was reasonably related to a valid penological interest, the Court first considers whether there is a "valid rational connection between the prison regulation and the government interest justifying it." Turner, 482 U.S. at 982-83. Turner does not require "actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational." Simpson v. Cty. of Cape Girardeau, Mo., 879 F.3d 273, 279 (8th Cir. 2018) (quoting Herlein v. Higgins, 172 F.3d 1089, 1091 (8th Cir. 1999)). The Eighth Circuit has recognized institutional security "as the most compelling government interest in a prison setting." Simpson, 879 F.3d at 279.

Defendants stated in their depositions that the purpose of confiscating Plaintiff's kufi was to improve the Detention Center's safety and security because a kufi could be used to secrete contraband, such as drugs, medication, and razors. There is a rational connection between the goal of reducing contraband in the Detention Center and the Detention Center's policy requiring administration inspection and approval of religious items, including kufis. See Butler-Bey v. Frey, 811 F.2d 449, 451 (8th Cir. 1987) ("prohibition against wearing [fezzes] in the prison visiting room, dining room, chapel, school, and administration building" was an "eminently reasonable" response to a "valid security concern"); Rogers v. Scurr, 676 F.2d 1211, 1215 (8th Cir. 1982) (policy prohibiting prayer caps and robes outside of prayer meetings was "substantially warranted by the requirements of prison safety and order").[18]

Plaintiff argues there is no rational connection between jail security and an approved-headwear-only policy because "Defendants have identified *no* security concerns relating to an Islamic Kufi…that makes them different than any other fabric item that Defendants issue to every inmate in their facility." [ECF No. 61 at 12 (emphasis in original)] This does not mean, however, that Defendants' policy was not rationally related to reducing the risk of contraband in

---

[18] Other circuits addressing this issue have similarly found that restricting the use of religious headwear had a reasonable relationship to the legitimate penological interest of prison security. See Hathcock v. Cohen, 287 Fed. Appx. 793, 800 (11th Cir. 2008) ("procedures requiring inspection and approval of apparel have a valid rational connection to a legitimate interest in ensuring that inmate apparel does not pose a threat to safety or security in the prison"); Muhammad v. Lynaugh, 966 F.2d 901, 902 (5th Cir. 1992) (prohibiting the wearing of kufis outside cells and chapel had "reasonable relationship to the legitimate penological interest of prison security"); Young v. Lane, 922 F.2d 370, 375-77 (7th Cir. 1991) (policy allowing Jewish inmates to wear yarmulkes only inside their cells and during religious services was rationally related to the prison's penological interest); Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir. 1990) (regulation that restricted the wearing of Rastafarian crowns to designated areas "comports with the type of penological interests contemplated under the *Turner/Shabazz* standard"). Cf. Ali v. Stephens, 69 F. Supp. 3d 633, 645-46 (E.D. Tex. 2014) (policy restricting kufis to designated areas did not further the asserted compelling penological interest in preventing concealment of contraband as required by the stricter standards of RLUIPA).

the Detention Center.  See e.g., Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1027 (8th Cir. 2004).  "[P]rison officials need only show that the regulated practice creates a *potential* threat to institutional security."  Butler-Bey, 811 F.2d at 451 (emphasis in original) (citing Jones v. N. Carolina Prisoners' Labor Union, 433 U.S. 119, 128 (1977)).  Accordingly, the first Turner factor weighs in favor of Defendants.

The second Turner factor requires a court to consider "whether there are alternative means of exercising the right that remain open to prison inmates."  Turner, 482 U.S. at 90 "The absence of any alternative…provides 'some evidence that the regulations [a]re unreasonable,' but is not 'conclusive' of the reasonableness of the Policy."  Beard v. Banks, 548 U.S. 521, 532 (2006) (quoting Overton, 539 U.S. at 135).

Courts have held that inmates have alternative means to exercise the asserted right to cover their heads when they are permitted to wear their religious headwear in designated areas, such as their cells and/or during religious services.  See Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992) ("By permitting inmates to wear Kufi caps and religious insignia in their cells and in religious services[, the defendant] has provided an opportunity for the exercise of religious freedoms as guaranteed by the Constitution."); Young v. Lane, 922 F.2d 370, 376 (7th Cir. 1991) ("defendants do allow plaintiffs to wear yarmulkes in their cells and during religious services, and plaintiffs are able to comply substantially with many of the demands of their religion"); Sledge v. Cummings, 995 F. Supp. 1276, 1281 (D. Kan. 1998) (plaintiff retains an alternative means of exercising his constitutional rights, in that he may wear his Kufi in his cell and while attending services).  Courts have also found that inmates had alternative means to practice the asserted right where the correctional facility provided inmates alternative head coverings.  See Thomas v. Bzoskie, No. 0:15-CV-2197-JRT-KMM, 2017 U.S. Dist. LEXIS

130019, at *33-34 (D. Minn. May 8, 2017) (policy prohibiting headwear was not unconstitutional where, upon request, defendants provided inmates "an extra pillowcase to keep in their [j]ail cells for use as a head cover when praying"); Jihad v. Fabian, No. 09-1604-SRN-LIB, 2011 WL 1641885, at *17 (Feb. 17, 2011) (prison policy that prohibited plaintiff from wearing his kufi outside designated areas, but made "readily available state-issued headwear," was not unconstitutional). See also Young, 922 F.2d at 378 (fact that the defendants allowed all inmates to wear baseball caps "does not remove the religious implications of the uniform headgear policy, [but] it certainly diminishes the plaintiffs' interest."). The record reveals that neither of these alternatives was available to Plaintiff.[19]

In support of their motion for summary judgment, Defendants assert that, "as an alternative to his personal Kufi, Detention Center policy allows Plaintiff to have a sheer black or white Kufi mailed to him for his personal use." [ECF No. 56 at 9] Indeed, Defendant Karol advised Plaintiff of this alternative in response to his inmate request and testified in her deposition that, if Plaintiff had obtained a sheer kufi, she would have approved it. However, Defendant Stolzer's deposition testimony undermines this assertion. In his deposition, Defendant Stolzer insisted that Defendants confiscated Plaintiff's kufi because the Detention Center did not issue it to Plaintiff, not because it was a thick, woven material. Defendant Stolzer also suggested that, even if Plaintiff's family or friends had mailed him a "correction-safe" kufi, Defendant Stolzer would not have permitted Plaintiff to have it. Based on Defendant Stolzer's testimony, and the fact that the Detention Center did not provide kufis or make them available in

---

[19] In her deposition testimony, Defendant Karol stated that, when inmates attempted to cover their heads with any item of clothing, correctional officers ordered them to remove it: "We don't allow headwear. I mean, obviously it is a correctional facility. They're going to put stuff on their head anyway. They'll wrap a T-shirt around their head or they'll – and we just tell them to remove it." [ECF No. 62-3 at 54]

the commissary, Plaintiff's only alternative was to order a "correction-safe" kufi directly from a retailer. The record contains no evidence relating to the availability of this option.[20] There is, therefore, a genuine dispute as to whether Plaintiff had alternative means to exercise his religious rights without undermining the legitimate penological interests identified by Defendants. The second <u>Turner</u> factor favors Plaintiff.

The third <u>Turner</u> factor considers what impact the "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." <u>Turner</u>, 482 U.S. at 90. A court gives particular deference "to the informed discretion of corrections officials" if the "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff" or "on the allocation of prison resources generally." <u>Id.</u>

Based on Defendants' evidence, it appears that the impact on Detention Center staff of allowing Plaintiff to wear his kufi would have been minimal. Indeed, Defendant Stolzer affirmed in his deposition that "if an inmate is wearing a kufi that would simply be another article that would have to be searched for contraband like the detention center is already doing[.]" [ECF No. 62-2 at 82]. <u>See, e.g.</u>, <u>Love v. Reed</u>, 216 F.3d 682, 691 (8th Cir. 2000) (impact of providing non-perishable food on Saturdays for the plaintiff's consumption on Sundays was minimal where defendants already prepared special dietary trays for inmates with other beliefs and guards regularly transported meals to inmates in other areas of the facility). For

_____

[20] There also exists a genuine question as to whether sheer black or white kufis are an available alternative to woven ones. While Defendant Karol testified that she has seen inmates wear such kufis, Plaintiff stated in his declaration: "Every Kufi I have ever seen has been made of fabric that is crocheted, knitted or woven." [ECF No. 62-1 at ¶ 14]. Additionally, Plaintiff stated that he asked his then attorney to send him a sheer or "correction safe" kufi, but the attorney "was unable to find one" and Plaintiff was "not aware that any such thing as a 'sheer' or 'corrections safe' Kufi exists." [<u>Id.</u> at ¶¶ 17-18]

his part, Plaintiff presented his declaration in which he stated that he wore a kufi "in several different correctional facilities," where officials "routinely searched my Islamic Kufi for contraband and this takes three to five seconds." [ECF No. 62-1 at ¶¶ 8-9] Plaintiff has therefore demonstrated a genuine dispute relating to the "ripple effect" of accommodation. The third <u>Turner</u> factor also weighs in favor of Plaintiff.

Finally, the Court considers whether the presence of ready alternatives undermines the reasonableness of Defendants' actions. <u>Turner</u>, 482 U.S. at 90-91. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Id.</u> at 91.

Plaintiff suggests that Defendants could have made "correction safe" kufis available in the commissary, as other corrections facilities have done. Defendant Stolzer stated in his deposition that, if the commissary sold pre-approved kufis, they would be no greater security concern "than any other article of clothing[.]" [ECF No. 62-2 at 81] Defendants presented no evidence that this alternative would have more than a *de minimis* cost to valid penological interests.[21] <u>See e.g.</u>, <u>id.</u> at 97-98. The fourth <u>Turner</u> factor weighs in Plaintiff's favor.

---

[21] Defendant Karol, however, opined that this was not a tenable alternative, stating in her deposition: "[W]e cannot sell [kufis] to general population because then they're going to buy it and wear it and then they're going to get in trouble for wearing it, and they're going to be, well, why did you let me buy it." [ECF No. 62-3 at 136] Defendant Karol did not elaborate on why the prospect of non-Muslim detainees obtaining pre-approved kufis precluded the Detention Center from selling kufis in the commissary. Moreover, as the Eighth Circuit observed in <u>Love v. Reed</u>, "If other prisoners request [religious] accommodations based upon sincerely held religious beliefs, then the [correctional facility] has an obligation to consider their requests. If other prisoners request [religious] accommodations which are based merely upon personal preference, the [correctional facility] will be under no obligation to provide those accommodations." 216 F.3d at 691.

Although Defendants satisfied the threshold requirement of establishing a "rational connection" between Defendants' actions and the Detention Center's safety and security, "Turner requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." Beard, 548 U.S. at 535. As the Supreme Court explained in Beard, the "real task in this case is…determining whether [Defendants] show[] more than simply a logical relation, that is, whether [they] show[] a *reasonable* relation." Id. at 533 (emphasis in original). Mindful that at this stage of the proceedings the Court must draw all justifiable inferences in Plaintiff's favor, Beard, 548 U.S. at 530, the Court finds that the confiscation of Plaintiff's kufi was not reasonably related to a penological interest so as to justify the infringement upon Plaintiff's First Amendment rights.

The Court therefore turns to question of whether Defendants are protected by qualified immunity. See Jones v. Hobbs, 864 F. Supp. 2d 808, 811-12 (E.D. Ark. 2012) ("If the impediment is not reasonably related to legitimate penological interests and, consequently, the defendants violated [the plaintiff's] statutory or constitutional rights, then the Court must determine whether the violated right was 'clearly established.'"). Defendants assert they are entitled to qualified immunity because "Plaintiff's perceived right to ***his*** Kufi…is not a clearly established constitutional right that a reasonable person, namely a Detention Center official, would have known." [ECF No. 56 at 15 (emphasis in original)] Plaintiff counters that his right to "wear ***a*** Kufi – at the very least in his cell and during religious services – is clearly established." [ECF No. 61 at 8 (emphasis added)]

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S.

635, 640 (1987)). "[T]he 'salient question' for the court to ask is whether the state of the law at the time gave the officials 'fair warning' their conduct was unlawful." <u>Sisney v. Reisch</u>, 674 F.3d 839, 845 (8th Cir. 2012) (quoting <u>Hope</u>, 536 U.S. at 741). "We answer this question by examining the 'specific actions' of the official." <u>Id.</u> at 845-46 (quoting <u>Norman v. Schuetzle</u>, 585 F.3d 1097, 1109 (8th Cir. 2009)).

Neither the Supreme Court nor the Eighth Circuit has held that an inmate is entitled to wear, at all times, the religious head covering of his choice. However, it is clearly established that a policy infringing upon an inmate's right to wear religious headwear must further some legitimate penological interest. <u>See</u> <u>Butler-Bey</u>, 811 F.2d at 451; <u>Rogers</u>, 676 F.3d at 1215-16.

As previously discussed, there exists a genuine question of fact as to whether Defendants' conduct was based upon a legitimate penological interest. The Court therefore finds that Defendants have not demonstrated they are entitled to qualified immunity. <u>See, e.g.</u>, <u>Boles v. Neet</u>, 486 F.3d 1177, 1184 (10th Cir. 2007) (because policy prohibiting inmate from wearing his religious garments in transport was not reasonably related to a legitimate penological interest, the defendant was not entitled to qualified immunity); <u>Barnes v. Furman</u>, 629 Fed. Appx. 52, 56 (2d Cir. 2015) (district court erred in holding defendants, who confiscated the plaintiff's religious head covering, were entitled to qualified immunity); <u>Branham v. Parker</u>, No. 7:15-CV-351, 2016 WL 1259106, at * 8 (W.D. Va. March 28, 2016) (defendants were not entitled to qualified immunity where they enforced the jail's policy banning prayer rugs). Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's section 1983 claim relating to confiscation of his kufi.

b. Plaintiff's prayer rug

Defendants assert they are entitled to summary judgment on Plaintiff's section 1983 claim arising from the confiscation of his prayer rug. Defendants argue they did not violate Plaintiff's free exercise rights because (1) legitimate security and safety concerns justified their actions and (2) the Detention Center "provides extra towels for Muslim inmates to use as prayer rugs." [ECF No. 56 at 10] In the alternative, Defendants argue they are entitled to qualified immunity because Plaintiff did not have a clearly established right to "*his* prayer rug." [Id. at 15 (emphasis in original)] In opposition to Defendants' motion for summary judgment, Plaintiff contends that Defendants violated his clearly established right "to use an Islamic prayer rug" and Defendants' justifications "for confiscating Plaintiff's prayer rug are conflicting, speculative, and not based on any valid penological interest." [ECF No. 61 at 13]

There is no dispute that, when Plaintiff arrived at the Detention Center, he had in his possession an Islamic prayer rug, which Defendants confiscated. [ECF No. 62 at ¶¶ 54, 58] Defendants subsequently denied Plaintiff's inmate requests and inmate grievances requesting the return of his prayer rug, but offered to make an extra bath towel available for Plaintiff to use while praying. [ECF Nos. 62 at ¶¶ 69, 70; 57-3]

According to Plaintiff's declaration, his sincerely held religious belief required that he, as a Muslim, "pray five times per day in a position of prostration on the ground, facing toward Mecca" and "Muslims should use an Islamic prayer rug during prayer to cover the ground and separate the body from the unclean floor." [ECF No. 62-1 at ¶¶ 27-28] Plaintiff stated that an Islamic prayer rug has a "niche," or triangular shape, near one end which "represents the mihrab in every mosque that points toward Mecca" and "should be positioned" to point toward Mecca during prayer. [Id. at ¶¶ 29-30]

Plaintiff attested that he purchased his prayer rug, which "included short fringe on each end," from the commissary at the St. Louis County Jail and used it at the St. Louis County Jail, St. Francis County Detention Center, Lincoln County Jail, and "federal facilities." [Id. at ¶¶ 32-33] According to Plaintiff's declaration, his sincerely held religious belief provided that "a towel is not a substitute for an Islamic prayer rug because other persons have used the towel to clean their bodies, and because a towel does not have the niche design of an actual Islamic prayer rug." [Id. at ¶ 39]

In her deposition, Defendant Karol described Plaintiff's prayer rug as "a very thick, heavy woven prayer rug." [ECF No. 62-3 at 50] Defendant Karol explained that "the only reasons the [prayer rug] was denied" were that "something could be secreted into it" and "it had fringe on either end and items like that can be removed and used in a harmful way or in a way that is untoward for the safety and security of the facility."[22] [Id.] Defendant Karol could not recall other Muslim inmates possessing an Islamic prayer rug or receiving one by mail because "[w]e provide towels….I've never had an experience where us accommodating them giving them a towel has been a problem." [Id. at 56]

Unlike Defendant Karol, who confiscated Plaintiff's prayer rug based on concern that it could be used to smuggle contraband *within* the Detention Center, Defendant Stolzer described at his deposition his concern that a prayer rug could be used to smuggle contraband *into* the Detention Center. Defendant Stolzer testified in his deposition that he did not deny Plaintiff possession of his prayer rug because of its thickness or fringe, stating "the only thing that matters

---

[22] Defendant Karol later elaborated, "the fringe is a concern because it can be removed and used – tied together used as a ligature or used as a device for inflicting harm onto another inmate or staff." [ECFV No. 62-3 at 92]

is that Mr. Wallace's…prayer rug w[as] not given to him by the Ste. Genevieve Detention Center."  [ECF No. 62-2 at 67]

As previously discussed, a prisoner's constitutional rights are subject to limitations "in light of the needs of the penal system." Gladson, 551 F.3d at 831 (quoting Murphy, 372 F.3d at 982).  "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests." Id. (quoting Murphy, 372 F.3d at 982).

Defendants contend that they are entitled to summary judgment because "the Detention Center's policy of [confiscating prayer rugs and] providing an extra towel for use as a prayer rug is reasonably related to a legitimate penological issue."  [ECF No. 56 at 11]  Applying the first factor of the reasonableness test set forth in Turner, the Court finds that the policy prohibiting prayer rugs was rationally connected to the Detention Center's legitimate interest in safety and security.  Both Defendants testified that the Detention Center prohibited prayer rugs because prisoners could use them to conceal contraband.  There is a rational relationship between reducing contraband and institutional security.  See Butler-Bey, 811 F.2d at 451; Benjamin, 905 F.2d at 578.

Applying the second Turner factor, the Court finds that Defendants offered Plaintiff sufficient alternative means to perform his daily prayers by offering him a towel in place of a prayer rug.  While Plaintiff rejected the towel because he considered it unclean, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." Murphy, 372 F.3d at 983.  Further, Plaintiff presents no evidence,

beyond his personal declaration, that a previously used but clean towel is not a religiously permissible substitute for a prayer rug.[23]

The third and fourth <u>Turner</u> factors also support the conclusion that confiscation of Plaintiff's prayer rug was reasonable. Plaintiff has not disputed Defendant Karol's statement that accommodating Plaintiff's request for his prayer rug would have placed increased demands on Detention Center staff. In her deposition, Defendant Karol explained that Plaintiff's prayer rug would have required close (and therefore time-consuming) inspection because "there is absolutely no way if he was hiding something in there that I would have been able to just feel around through it or look through it and find contraband." [ECF No. 62-3 at 118] <u>See</u> <u>Benjamin</u>, 905 F.2d at 579 (noting the "obvious increase in guard/inmate contact that would result from the searches of [Rastafarian] crowns," the court held that restriction on crowns, but not yarmulkes or kufis, did not violate the plaintiffs' equal protection rights). Additionally, there was no "easy, obvious alternative" to towels as prayer rugs that would further Defendants' legitimate penological interest in reducing contraband at *de minimis* cost to the Detention Center.

Because all four <u>Turner</u> factors weigh in favor of Defendants, the Court finds that Defendants' confiscation of Plaintiff's prayer rug and offer of a towel as a substitute was

---

[23] Other courts have reached similar conclusions in cases involving alleged free exercise violations due to policies banning prayer rugs, where the facility provided extra towels to use for prayer. <u>See</u> <u>Thomas</u>, 2017 U.S. Dist. LEXIS 130019, at *33 (defendants did not violate the plaintiff's free exercise rights by banning prayer rugs where the plaintiff "was provided…an additional towel to substitute for his desire to possess…a prayer rug"); <u>Hudson v. Maloney</u>, 326 F. Supp. 2d 206, 209 n. 2 (D. Mass. 2004) (ban on prayer rugs was constitutional because (1) it was justified by security and safety concerns and (2) "plaintiffs point to no tenet of the Muslim faith that requires that the prayer ritual be performed on a prayer rug as opposed to a prayer towel."); <u>Shepard v. Peryam</u>, 657 F. Supp. 2d 1331, 1352 (S.D. Fl. 2009) ("absent a showing that use of a prayer towel will not suffice to meet the Muslim faith's requirement, it is not clear that denying a prayer rug and offering ability to use prayer towels instead, implicates a constitutional right"). <u>Cf.</u> <u>Branham</u>, 2016 WL 1259106, at *6-8 (defendants were entitled to qualified immunity as to the practice of offering a previously-used towel as a prayer rug but they were not entitled to qualified immunity as to the policy of banning prayer rugs).

reasonably related to legitimate penological interests. Accordingly, Defendants' actions in regard to Plaintiff's prayer rug did not violate Plaintiff's free exercise rights, and Defendants are entitled to summary judgment on this claim.

### 3. Conclusion

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Plaintiff's official capacity claims against Defendants are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment [ECF No. 55] is **GRANTED** in part and **DENIED** in part. Summary judgment is granted as to Defendant's section 1983 claims arising from the confiscation of his prayer rug and denial of his request for congregational prayer. Plaintiff's section 1983 claim arising from the confiscation of his kufi remains for trial.

The case will be set for trial by separate order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE


Dated this 15th day of April, 2019